**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

**ARNI LARUSSON P/K/A ICE STARR,**

              Plaintiff,

v.

**JEREMY BIDDLE** a/k/a Yung Bleu a/k/a Bleu
Vandross;
**TAQUARI HATCH** a/k/a RESRV;
**TORENCE HATCH** a/k/a Boozie Badazz
**BAD AZZ MUSIC SYNDICATE, LLC;**
**BAD AZZ MUSIC PUBLISHING, L.L.C.;**
**BAD AZZ RECORDS, L.L.C;**
**BAD AZZ MANAGEMENT, L.C.C.;**
**BAD AZZ, LLC**
**VANDROSS MUSIC GROUP, INC.;**
**SONY MUSIC ENTERTAINMENT;**
**COLUMBIA RECORDS, INC.;**
**EMPIRE DISTRIBUTION, INC.;**
**916 ENTERTAINMENT GROUP, LLC;**
**VICE AND PLAY PRODUCTIONS, LLC;**
**HORUS MUSIC LIMITED;**
**BROADBAND TV CORP** d/b/a VISO Music;
and
**JOHN DOES NO. 1-20;**

              Defendants.

</td><td>

**COMPLAINT FOR DAMAGES**

Case No.1: 21-cv- 4895

<u>**JURY TRIAL REQUESTED**</u>

</td></tr>
</table>

## **INTRODUCTION**

1.  Arni Larusson, professionally known as Ice Starr, is a producer, songwriter, and creator of

    musical compositions including instrumentals for hip hop songs. Mr. Larusson brings this

    copyright infringement action because Jeremy Biddle a/k/a Yung Bleu a/k/a Bleu Vandross

    ("Yung Bleu") and the other Defendants in this action have knowingly, willfully, and

continuously used at least eleven (11) of Mr. Larusson's compositions and recordings without authorization and in violation of law.

2.   Beginning as early as 2017, and continuing to this day, Yung Bleu and Taquari Hatch began taking Larusson's compositions and adding lyrical components to the compositions to create new, derivative works released as Yung Bleu songs. Nearly all of the original Larusson recordings were posted by on sites such as Beatstars and YouTube, where artists and fans could become familiar with Larusson's work, obtain a limited-use or non-profit license, or contact Larusson to buy exclusive rights or obtain Larusson's production services.

3.   Instead of compensating Larusson, Yung Bleu and Taqauri Hatch simply stole them or, in the case of the song Miss It, bought an inexpensive non-exclusive license and then monetized the song in gross violation of that limited license. Miss *It*, which is a derivative work of the Larusson work Miss *You*, has been widely acknowledged by the media as being the catalyst for Yung Bleu's breakout as a successful hip hop and R&B artist. Larusson has received zero royalties for Miss It, which remains one of Yung Bleu's most popular tracks today.

4.   Further, at least six songs on Yung Bleu's popular "Investments 5" album used compositions and recordings that Yung Bleu and Taqauri Hatch simply stole from Larusson. Upon information and belief, Yung Bleu and Taqauri Hatch ripped these beats from Larusson's YouTube page, without authorization, and then used them to create the derivative works *We All We Got*, *Smooth Operator (feat. Lil Durk)*, *Hoop Dreams*, *Wanna Fuck*, *Bought a Patek*, and *Plotting* and then released the same on the Investments 5 album which has achieved millions upon millions of streams.

5. Defendants have committed similar infringement with regard to other tracks, including *Miss It (feat. Kid Ink) (Remix)*, *Ice On My Baby*, *Ice On My Baby (feat. Kevin Gates) (Remix)*, *Old Me (feat. Moneybagg Yo), The Plan*, and *My Boys*, Together with *We All We Got*, *Smooth Operator (feat. Lil Durk)*, *Hoop Dreams*, *Wanna Fuck*, *Bought a Patek*, and *Plotting*. These will collectively be referred to as the "Infringing Works."

6. Defendants' infringement is so brazen that they even incorporated the Ice Starr vocal tag throughout the infringing works, short audio snippets of the words "ice" and "star" in Larusson's recordings that identifies him as creator and producer in the Infringing Works as an audio "watermark" to protect against infringement.

7. The unauthorized use of Larusson's compositions and recordings launched Yung Bleu's career to stardom. The Infringing Works have achieved hundreds of millions of sales and streams across numerous music platforms, and have led to vast other revenues collected by Yung Bleu and the other Defendants.

8. Larusson brings this action to recoup the revenues taken by Defendants through their disregard and willful infringement of Larusson's rights under the Copyright Act and to dissuade future repetition of this misconduct.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, et. seq and the Declaratory Judgment Act 28 U.S.C. §§ 2201. Federal Courts have exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

10. This Court has personal jurisdiction over Defendants because they have directed their activities and marketing of the infringing works to New York residents, and New York

residents are able to purchase, download, and stream the infringing compositions and recordings.

11. Defendants have engaged in systematic and continuous business activities relating to the Infringing Works. As such, the Defendants have engaged in continuing business activities in the instant jurisdiction. Venue is proper in this district under 28 U.S.C. § 1400(a) because Defendants Sony Music Entertainment and Columbia Records reside in this district. Venue is also proper because a substantial part of the events giving rise to the claims occurred in this district, 28 U.S.C. § 1391(b)(2).

12. The Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

13. Defendant Yung Bleu has performed, and he and the other Defendants have authorized, organized, and promoted performances of the infringing work numerous times in New York, as well as throughout the United States.

14. The Defendants have generated touring and recording revenues from the unauthorized and unlawful exploitation of the infringing work, including receiving substantial revenue from such exploitation in New York, as well as throughout the United States. They have advertised the Infringing Works to New York residents, as well as throughout the United States.

15. The Defendants, individually and collectively, have generated substantial revenue from the exploitation of the infringing works in New York, and throughout the United States.

16. New York has a considerable interest in adjudicating disputes wherein New York residents are the target of the harm resulting from exploitation of the infringing work.

17. Venue is proper in this Judicial District pursuant to 28 U.S.C §1391(b), §1391(c), and §1400(a), respectively, because certain Defendants maintain offices in and are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District. Further, a substantial part of the events that give rise to this claim, as described above, occurred in this Judicial District.

## PARTIES

**Defendants**

18. Jeremy Biddle a/k/a Yung Bleu is a resident of the State of Alabama, and regularly conducts business in New York.

19. Taquari Hatch ("TQ Hatch") a/k/a RESRV, who on information and belief is a resident of the State of Louisiana, and regularly conducts business in New York.

20. Torence Hatch a/k/a Boozie Badazz is a resident of State of Louisiana, and in any event, regularly conducts business in New York.

21. Bad Azz Music Syndicate, LLC ("Bad Azz Music") is a Louisiana limited liability company with a principal place of business at 3098 Oak Crest Drive Baton Rouge, LA 70815. Bad Azz Music Syndicate, LLC's registered agent is Taqauri Hatch at the address 1315 S Jefferson Davis Pwky, Unit 224, New Orleans, LA 70215. Bad Azz Music has published, distributed, and/or advertised Yung Bleu's songs in New York.

22. Bad Azz Publishing, L.L.C. ("Bad Azz Pub") is a Louisiana limited liability company with a principal place of business at 3098 Oak Crest Drive Baton Rouge, LA 70815. Bad Azz Pub's registered officer is Torence Hatch at the address 3098 Oak Crest Drive, Baton Rouge, LA 70814. Bad Azz Pub has published, distributed, and/or advertised Yung Bleu's songs in New York.

23. Bad Azz Records, L.L.C. ("Bad Azz Rec") is a Louisiana limited liability company with a principal place of business at 3098 Oak Crest Drive Baton Rouge, LA 70815. Bad Azz Rec's registered officer is Torence Hatch at the address 3098 Oak Crest Drive, Baton Rouge, LA 70814 Bad Azz Rec has published, distributed, and/or advertised Yung Bleu's songs in New York.

24. Bad Azz Management, L.L.C. ("Bad Azz Mgmt") is a Louisiana limited liability company with a principal place of business at 3098 Oak Crest Drive Baton Rouge, LA 70815. Bad Azz Mant's registered officer is Torence Hatch at the address 3098 Oak Crest Drive, Baton Rouge, LA 70814. Bad Azz Mgmt has published, distributed, and/or advertised Yung Bleu's songs in New York.

25. Bad Azz, LLC is a Louisiana limited liability company with a principal place of business at 3098 Oak Crest Drive Baton Rouge, LA 70815. Bad Azz, LLC's registered officer is Torence Hatch at the address 3098 Oak Crest Drive, Baton Rouge, LA 70814. Bad Azz, LLC has published, distributed, and/or advertised Yung Bleu's songs in New York.

26. Defendants Bad Azz Music, Bad Azz Pub, Bad Azz Rec, Bad Azz Mgmt, and Bad Azz, LLC shall be collectively referred to as the "Bad Azz Defendants."

27. Add in some allegations about how the Bad Azz and other specific defendants are all entities under the control of TQ and Boozie, or something that ties them down more than just the listing of the registered agents (unless that is already done somewhere else). Bad Azz Defendants are entities under the control of Torence Hatch and Taquari Hatch. These entities were created around the Bad Azz music label and were founded between the years 2006 and 2014. The Bad Azz Music Syndicate became the flagship label due to a rebrand in the year 2014.

28. Vandross Music Group, LLC is a Mississippi limited liability company. Its registered agent is Jeremy Biddle at the address 15143 Haversham Place Diberville, MS 39540. Vandross Music Group, LLC has published, distributed, and/or advertised Yung Bleu's songs in New York.

29. Sony Music Entertainment is a Delaware partnership with a principal place of business at 25 Madison Ave, New York, NY, 10010. It is the parent company of Columbia Records and is the copyright claimant of such songs as "Miss It" and "Ice On My Baby."

30. Columbia Records ("Columbia") is a Delaware partnership with a principal place of business at 550 Madison Ave New York, NY 10022. Columbia has published, distributed, and/or advertised Yung Bleu's songs in New York.

31. EMPIRE Distribution, Inc. ("Empire") is a California corporation with a place of business at 235 Pine Street, San Francisco, CA 94104. Its registered agent is Michael Gallegus at 235 Pine Street, San Francisco, CA 94104. Empire has published, distributed, and/or advertised Yung Bleu's songs in New York.

32. Vice and Play Management, LLC ("Vice and Play Mgmt") is a Louisiana limited liability company that has a principal place of business at 1000 Girod St, New Orleans, LA 70113. Its registered agent is Taqauri Hatch at the address 1000 Girod St, New Orleans, LA 70113.

33. Vice and Play Productions LLC ("Vice and Play Prod") is a Louisiana limited liability company that has a principal place of business at 4412 Barnett St., Unit B, Metairie, LA 70006. Its registered agent is Taqauri Hatch at the address 1315 S Jefferson Davis Pwky, Unit 224, New Orleans, LA 70215.

34. Horus Music Limited ("Horus Music") is a United Kingdom private limited company with a principal place of business at 346 Loughborough Road, Leicester LE4 5PJ.

35. 916 Entertainment Group, LLC ("916%") is a Nevada limited liability company. Its registered agent is Nevada Corporate Agent Services, Inc. at 2700 E Sunset Rd Suite 9, Las Vegas, NV, 89120.

36. BroadbandTV Corp. ("BBTV") is a company incorporated under the British Columbia Business Corporations Act. Its primary place of business and registered office is located at 1205 Melville Street, Vancouver, British Columbia, Canada, V6E 0A6 Its domestic registered agent is National Corporate Research, ltd. 122 East 42nd Street 18th Floor New York, New York, 10168.

37. John Doe #1 is believed to be a Delaware corporation and is an online distributor.

38. Upon information and belief, Defendants John Does #2-10 are one or more individuals and/or entities who participated in, facilitated, encouraged, and/or had supervisory authority over the infringement set forth herein, and are therefore wholly or partially liable therefore.

39. Upon information and belief, Defendants John Does #11-20 are one or more individuals and/or entities who are performing rights organizations ("PRO") or who administer the catalog of the infringing works. Defendants John Does #11-20 have collected license fees from performances of the Infringing Works set forth herein.

**Plaintiff Arni Larusson**

40. Arni Larusson, who is professionally known as Ice Starr, is a resident of Reykjavik, Iceland, and regularly conducts business in New York.

41. Arni Larusson's management team is based in New York and has a principal office in the State of New York.

## BACKGROUND

I. ***Ice Starr is a successful music producer who focuses on creating compositions and recordings for hip-hop artists.***

42. Plaintiff Arni Larusson creates compositions and recordings, many of which are then licensed or sold to hip-hop artists, including for the creation of derivative works.

43. Larusson's compositions exemplify a prevalent and popular genre of music, which frequently combines elements of hip hop, R&B, and trap.

44. Early on in his career, Larusson began posting his works on the Soundclick and Beatstars platforms, online marketplaces for the purchase and sale of limited licenses of compositions and recording.

45. Larusson quickly gained popularity on the Soundclick[1] and Beatstars platforms.[2]

46. Today, Larusson's tracks have over 1 million plays on Beatstars, which has made him one of the top producers on the platform.

47. By using the Soundclick and Beatstars platforms, Larusson is able to offer compositions and recordings for sale or license to upcoming artists with negotiable licensing terms.

---

[1] Larusson's Soundclick page can be accessed at https://www.soundclick.com/artist/default.cfm?bandID=1057724
[2] Larusson's Beatstars page can be accessed at https://www.beatstars.com/icestarr.
.

48. Under a typical basic arrangement, an artist can purchase a *non-exclusive* license for the use of a composition and recording from Larusson for only $29.99 ("Standard Beatstars License").

49. This Standard Beatstars License would generally allow unlimited *non-profit* use of the composition and recording, but at the same time places strict limitations on the permissible for-profit uses.

50. For example, the Standard Beatstars License only permits up to 500,000 monetized streams of a song before a further license is must be separately negotiated.

51. Thus, for songs that achieve even modest commercial popularity, a further license from Larusson must be negotiated and entered into.

52. Soundclick is similar to the Beatstars platform, however the underlying compositions are available to download for free to sample for non-profit uses.

53. Unlike Beatstars, all payments under Soundclick are made through PayPal.

54. The Soundclick free downloads of Larusson's songs contained numerous watermarks where the name "Ice Starr" is regularly repeated throughout the track at different intervals.

55. Upon purchase of a limited license on Soundclick, the watermarks may be removed or otherwise reduced throughout the recording, allowing the purchasing artist to create a new licensable composition without the Ice Starr watermarks included.

56. In addition to Beatstars and Soundclick, Larusson also posts compositions and recordings for non-profit use on his YouTube account,[3] his own webpage[4] and through other platforms under his control.

57. Both early in his career and to this day, a substantial portion of Larusson's income and livelihood has depended on his ability to sell non-exclusive, limited licenses to his compositions and recordings through the aforementioned platforms.

58. Larusson's compositions and recordings formed the essence of Yung Bleu's musical style and launched him to popularity.

59. In particular, the songs *Miss It* and *Ice On My Baby*, which are both derivative works of Larusson's compositions, *Miss You* and *Holla*, were Yung Bleu's first hit songs and his first songs to achieve RIAA Gold status – meaning that the single sold 500,000 units or digital equivalents.

60. In May, 2021, the song *Miss It* has now achieved RIAA Platinum status – meaning the single sold 1,000,000 units or digital equivalents.

61. Ice Starr has collaborated with many artists, such as K Camp, Kevin Gates, Lil Mosey, D-Block Europe, Lil Tjay, Moneybagg Yo, Yungeen Ace, Lil Durk, Boozie Badazz, A Boogie Wit A Hoodie and others.

**II.**     ***Yung Bleu is an up-and-coming hip hop artist who has recently reached superstar status.***

62. Jeremy Biddle, professionally known as Yung Bleu, and also known as Bleu Vandross, is a hip-hop artist based in Mobile, Alabama.

---

[3] Larusson's YouTube page can be accessed at https://www.youtube.com/user/icestarrbeatz/featured
[4] Larusson's Webpage can be accessed at http://www.icestarr.com/

63. According to Biddle's Spotify biography, he began rapping at 11 years old and began creating and releasing mixtapes in his late teens.

64. Yung Bleu subsequently began releasing a series of mixtapes and albums called the "Investments" series (also abbreviated as "INV"), which helped Yung Bleu build his reputation and gain a modest following.

65. Around the same time, Yung Bleu became affiliated with rapper Torence Hatch, professionally known as Boosie Badazz. Yung Bleu joined the record label Bad Azz Music Syndicate, which was founded by Torence Hatch and Torence Hatch's manager, Taquari "TQ" Hatch.

66. The Bad Azz Defendants are all part of the same distribution, publishing, recording, marketing, and advertising organization under Torence and Taquari Hatch's control.

67. Eventually, the Investments albums—and songs such as the breakout hits Miss It and Ice On My Baby—helped land Yung Bleu a deal with Columbia Records ("Columbia") via Mr. Hatch's imprint Badazz Music Syndicate.

68. With Columbia's support, Yung Bleu continued to increase his fame. He released additional projects and monetized prior projects during his time with Columbia in 2018 and 2019.

69. After Yung Bleu's deal with Columbia ended in 2020, Yung Bleu launched an independent label, Vandross Music Group, and signed a distribution deal with Empire.

70. In late 2020, Yung Bleu's fortunes took another extremely positive turn. After a fortuitous social media exchange facilitated by NBA player DeMarcus Cousins, Yung Bleu was given one of the most coveted opportunities in popular music: a collaboration with global superstar Aubrey Drake Graham, who is professionally known as Drake.

71. The Drake collaboration was an alternate version of the track *You're Mines Still*, which featured vocal performances by Yung Bleu and Drake. *You're Mines Still* became one of Yung Bleu's most popular songs, in addition to the Larusson-produced RIAA Gold Certified tracks *Miss It* and *Ice On My Baby*.

72. Coming off his collaboration with Drake, which is so helpful to up-and-coming musical artists that it is known as the "Drake Stimulus Package," Yung Bleu is positioned to continue growing his stardom and wealth.

73. While Yung Bleu's recent collaboration with Drake has brought him millions of dollars[5], it has also substantially increased the revenues and value of Yung Bleu's existing catalog, including the Investments 5 album and prior hits such as *Miss It* and *Ice On My Baby* and the remixes of those songs.

74. In numerous interviews and social media posts, Yung Bleu has bragged about the millions of dollars he has made and lavish purchases such as a mega-mansion and luxury cars.

75. Yung Bleu recently posted a video on Instagram in which he gave Defendant Torence Hatch $100,000 in cash as a reward for Torence Hatch's support in launching Yung Bleu's career.

76. Yet Yung Bleu achieved his musical and financial success via the unauthorized use of Larusson's compositions and recordings.

77. While Yung Bleu has awarded his friends sums such as $100,000 in cash, Larusson has been paid next to nothing; he received two $750.00 payments under sham "work for hire"

---

[5] Amaar Burton *Yung Bleu Credits Drake for Making Him Millions* (May 14, 2021, 1:18PM), https://www.sohh.com/yung-bleu-credits-drake-for-making-him-millions/
[https://web.archive.org/web/20210514191029/https://www.sohh.com/yung-bleu-credits-drake-for-making-him-millions/]

employment certificates in 2017 and 2018 for two of the infringing tracks, and nothing at all for the rest.

>    a. *Yung Bleu's unauthorized use of Ice Starr's work Miss It was a catalyst in his launch to fame and wealth.*

78. Long before Yung Bleu reached the level of wealth and stardom that he is at today, Yung Bleu was releasing songs and albums for a modest audience.

79. Yung Bleu's popularity began to change in 2017 when Yung Bleu and his team began to take Larusson's compositions and recordings for their own use.

80. These Larusson compositions and recordings became Yung Bleu's most successful songs yet, including *Miss It* and *Ice On My Baby*, and vaulted Yung Bleu into stardom.

81. Additionally, Yung Bleu's extremely successful Investments 5 album prominently features Larusson's compositions and recordings—although the use of Larusson's work was done without his knowledge, authorization, and without any compensation whatsoever.

82. In early 2017, Mr. Larusson created a composition and recording titled *Miss You*, which he posted on Beatstars[6] and Soundclick[7] on January 23, 2017, and on YouTube[8] on January 24, 2017.

83. On information and belief, prior to February 14, 2017, TQ Hatch ripped the *Miss You* composition and recording from Larusson's music video for *Miss You* posted on January 24, 2017, presumably using a third party YouTube to mp3 converter.

---

[6] https://www.beatstars.com/beat/miss-you-473603
[7] https://www.soundclick.com/music/songInfo.cfm?songID=13519480
[8] https://www.youtube.com/watch?v=XwUt4_g4cFI

84. Around the time the composition and recording were taken from Larusson, TQ Hatch was charged with siphoning $361,000 from Torence Hatch's bank accounts.

85. On information and belief, TQ Hatch provided Torence Hatch and Yung Bleu Larusson's recordings and compositions to either pay off the debt or get back in the Yung Bleu team's good graces.

86. After "ripping" the recording, TQ Hatch and Yung Bleu used the *Miss You* composition to create Yung Bleu's own derivative work, *Miss It*, with Yung Bleu adding vocals to the Ice Starr instrumental.

87. A little over a month later, after Larusson had already created and posted the *Miss You* recordings, representatives for hip hop artist Yung Bleu, namely TQ Hatch, reached out to Mr. Larusson about the process for purchasing exclusive rights to Ice Starr beats.

88. The communication came on February 25, 2017, eleven (11) days after Yung Blue had already posted the infringing derivative work *Miss It*.

From: **BADAZZ ONLINE** <tq@badazzmusic.com>
Date: Sat, Feb 25, 2017 at 7:43 PM
To: <ICESTARRBEATZ@gmail.com>

Wassup,

How much is it for exclusive rights to your beats? I'm trying to pitch you to Boosie.

--
Taquari "TQ" Hatch
Manager: Boosie Badazz
Phone: 504-413-3029
COO of Bad Azz Music Syndicate
Instagram: @therealtq

FOLLOW BOOSIE:Instagram  I Twitter I Tumblr I Facebook

**BADAZZ**
MUSIC SYNDICATE

89. Larusson offered TQ Hatch the opportunity to purchase exclusive rights to *Miss You*. Larusson's proposed arrangement would have included the industry-standard production agreement whereby Larusson would have received fifty percent of publishing royalties.

90. Larusson did not know that TQ Hatch and Yung Bleu had already used Miss You to publish the derivative work Miss It prior to these conversations on February 14, 2017.

91. On February 26, 2017, TQ Hatch stated to Larusson that he had purchased a limited-use lease for the composition and recording titled Miss You, through the Soundclick platform.

92. TQ Hatch indicated to Larusson on February 26, 2017, that the *Miss You* composition and recording would be used for "a remix."

93. Based on TQ Hatch's representation that he had purchased a limited-use lease through Soundclick, Larusson sent TQ Hatch track-out copies of the composition and recordings titled *Miss You*.

94. However, on information and belief, TQ Hatch was attempting to retroactively gain licensing for an illegitimately made derivative work that he and Yung Bleu had previously published on February 14, 2017, without Mr. Larusson's knowledge.

95. Both *Miss You* and *Miss It* contain identical instrumental and non-vocal elements, with the only difference between the two works being the addition of a vocal performance by Yung Bleu on *Miss It*.

96. Yung Bleu's *Miss It* derivative work includes the Ice Starr watermark throughout identifying the work as Larusson's.

97. *Miss It* quickly became Yung Bleu's most popular track to date and has been described as his breakout moment[9] and a "prime example of what sets Yung Bleu apart" artistically.[10]

98. The song has also been a commercial success, achieving hundreds of millions of views on YouTube, nearly 29 million streams on Spotify, 100 million streams on Pandora, at least 40 million streams on Soundcloud, and has recently been certified platinum – for 1 million copies either sold or sale-equivalent streams.

99. Moreover, the song reached number six on the R&B radio charts, has a popular music video, has been a staple of Yung Bleu's live performances, and was later remixed with a featured verse from artist Kid Ink.

100. Defendants never paid Larusson royalties based upon any of these revenues.

101. In June of 2017, months after *Miss It* was released and generating revenue, Defendant Vice and Play sent Mr. Larusson a "Certificate of Employment" and $750 payment purportedly for a "work-for-hire" employment arrangement for the *Miss It* derivative work and master (the "Miss It Employment Certificate"). A copy is attached hereto as Exhibit 1.

102. While Larusson had discussed an exclusive license agreement regarding the recording and composition for *Miss You* on February 25, 2017, this was based upon Larusson's interest of establishing a good relationship with TQ Hatch and the Bad Azz Defendants to generate potential future revenue earnings.

---

[9] *See* Andy Kellman, *Bleu broke out in a big way with the 2017 single 'Miss It',* AllMusic (May 14, 2021, 1:29PM), https://www.allmusic.com/artist/yung-bleu-mn0003407556/biography [https://web.archive.org/web/20210514192817/https://www.allmusic.com/artist/yung-bleu-mn0003407556/biography]
[10] *See* Lawrence Specker, '*Investments' paying off for Alabama rapper Yung Bleu*, AL.com (May 14, 2021, 1:34PM), https://www.al.com/life/2019/09/investments-paying-off-for-alabama-rapper-yung-bleu.html [https://web.archive.org/web/20210514193109/https://www.al.com/life/2019/09/investments-paying-off-for-alabama-rapper-yung-bleu.html]

103.     On information and belief, TQ Hatch and Bad Azz Music induced Mr. Larusson

into an invalid work-for-hire agreement that also purported to assign-away his rights, and

continue to improperly use his recordings and compositions to create derivative works for

the benefit of Defendants.

104.     On June 26, 2017, at TQ Hatch's urging, Larusson signed the Miss It

Employment Certificate, five months after Larusson had already published the *Miss You*

recording and composition and four months after Yung Bleu published the derivative

work *Miss It*.

105.     Besides Mr. Larusson, no other party signed the Certificate, and no attorney

reviewed the Certificate on behalf of Mr. Larusson.

106.     The Miss It Employment Certificate is titled "Certificate of Employment."

107.     The Miss It Employment Certificate in relevant part states that:

> Reference is hereby made to that certain recording project presently
> untitled ("Project") comprised of musical performances of Yung
> Bleu ("Artist") for which the undersigned, **Árni Lárusson**,
> ("Contributor") provided certain music production services (the
> "Services") for a master recording currently entitled "*Miss It*" (the
> "Master"). Such Project, Services and the Master were
> commissioned by **Vice and Play Management, LLC**
> ("Company").

Exhibit 1.

108.     Contrary to the representations in the Certificate, Larusson never performed any

services for Vice and Play nor did he provide certain production services for a master

recording entitled *Miss It*.

109.     Vice and Play never commissioned Larusson to perform any services.

110.     Yung Bleu inappropriately obtained Larusson's composition and recording and

published the derivative work *Miss It* prior to February 14, 2017.

111.     The Miss It Employment Certificate states that "[Larusson's] Services of every kind heretofor rendered by and hereafter to be rendered by [Laursson] in connection with the Project . . . are and shall be deemed works 'made-for-hire'" Exhibit 1.

112.     Accordingly, because the *Miss You* recording and composition had already been created by Larusson and published in January 2017, Vice and Play never provided the impetus for, participated in, or had any ability to supervise the creation of the work.

113.     Likewise, Vice and Play never invested in the creation of the work whatsoever.

114.     The Miss It Employment Certificate is a sham work-for-hire document that attempts to bootstrap an assignment of Larusson's rights to the already infringed derivative work Miss It.

115.     However, the Miss It Employment Certificate is invalid in its entirety because it is founded on a false premise that Larusson provided "production services for a master recording entitled 'Miss It'".

116.     This is supported by the misrepresentation and omission by TQ Hatch that the *Miss It* derivative work had already been published in February of 2017.

117.     The Miss It Employment Certificate likewise fails to address and contains a material misrepresentation and omission that the *Miss You* sound recording and composition was not created for the *Miss It* derivative work, and instead was already infringed upon by Yung Bleu and Taquari Hatch.

118.     Accordingly, the Miss It Employment Certificate is invalid, void, and/or unenforceable.

119.     Mr. Larusson has never been paid any royalties for Yung Bleu's derivative work *Miss It*, including for revenues generated before June 26, 2017, when the beat was being

used in a completely unauthorized manner, or after June 26, 2017, during which Mr.

Larusson should have been receiving publishing and mechanical royalties.

120.        And, as the song *Miss It* became highly popular and achieved Gold status, Yung

Bleu released unauthorized versions which did not credit Mr. Larusson for his production

whatsoever. For example, the below screenshot showing BMI publishing for *Miss It*

shows that Yung Bleu and TQ Hatch are credited for songwriting and composition, but

not Larusson in any way.



a.  ***Ice Starr provides the production and songwriting authorship for six songs on the
    Investments 5 project but receives zero credit and zero payment.***

121.        In 2018, Yung Bleu released the Investments 5 album, which marked his most

successful project yet and an inflection point in his growing popularity.

122.        The Investments 5 album was published by Defendant 916% Entertainment

Group LLC on February 14, 2018.

123.     The Investments 5 album prominently features derivative works of Larusson's compositions and recordings.

124.     The following songs from the Investments 5 album are completely unauthorized derivative works of Larusson's corresponding musical compositions and recordings listed, upon which Yung Bleu merely added a vocal performance:

| Larusson Composition and Recording | Yung Bleu Unauthorized Song |
|---|---|
| *Atlantic* | *Smooth Operator* |
| *Too Late* | *We All We Got* |
| *Big Dreams* | *Hoop Dreams* |
| *Deja Vu* | *Wanna Fuck* |
| *Came From Nothing* | *Plotting* |
| *Die A G* | *Bought a Patek* |

125.     Larusson first published the original Composition and Recordings of the Investments 5 infringing works on March 18, 2016.

126.     On information and belief, Yung Bleu's team "ripped" the audio of Larusson's recordings from YouTube using an MP3 converter in order to take the recording for their own use without Larusson's knowledge.

127.     While all of these songs continue generating massive revenue for Yung Bleu and distributors, Larusson has not been compensated in any way for his work.

128.     The tracks are completely unauthorized use and derivative works of Larusson's songs, including compositions and recordings.

129.     Yung Bleu and his team are well-aware of their unauthorized use but continue to make money from these tracks, while paying Larusson nothing.

130.     On each and every one of the Infringing Works, the Ice Starr watermark can be clearly and repeatedly heard.

131.    The Infringing Works have collectively achieved hundreds of millions of streams and sales. They have been performed by Yung Bleu at live shows, featured in videos and on social media, and have helped propel Yung Bleu to further fame and success.

132.    Larusson's original sound recordings and compositions are strikingly similar to the Infringing works.

133.    All of the Infringing Works adopted the elements of both the recording and compositional copyrights of Larusson's original works.

134.    Specifically, the harmonic similarities of all the Infringing Works and Larusson's compositions and sound recordings are nearly identical. Effectively, Larusson's compositions and sound recordings are woven into the overlaid vocal tracks.

135.    Defendants Yung Bleu and Taquari Hatch took Mr. Larusson's sound recordings in full, used the sound recordings as they were, and Yung Bleu rapped vocal tracks over them.

136.    Yung Bleu and Taquari Hatch did not hire musicians or any instrumentalists to come in and alter the underlying Larusson compositions – they were simply incorporated in toto.

137.    Larusson's sound recordings provide the entire musical backdrop for the Infringing Works.

138.    Out of the entirety of the Infringing works, Larusson's underlying sound recordings and compositions occupy approximately ninety percent (90%) of the Yung Bleu tracks.

139.    Even multiple of the titles of Yung Bleu's songs were lifted or were otherwise inspired by the titles of Larusson's recordings and compositions.

140.     For example, Larusson's composition and recording *The Plan* was used as the underlying composition and recording for the infringing work with the exact same title. Additional examples include the Larusson composition and recording *Big Dreams,* which was used by the Yung Bleu infringing work *Hoop Dreams*, and the Yung Bleu song *Miss It* which uses the Larusson composition and recording titled *Miss You*.

141.     Based upon the use of Larusson's original titles and the incorporation of those titles into the lyrical tracks of the Infringing Works, Yung Bleu's lyrical and vocal performances on the Infringing Works were also inspired by Larusson's recordings and compositions.

142.     Yung Bleu's team was well aware of Larusson's contributions, not only because they took compositions and recordings for unauthorized use and left the Ice Starr watermark in the finished songs, but also because of their communications with Mr. Larusson.

143.     For example, at one point, TQ Hatch reached out to Larusson about the Investments 5 project and asked Larusson to identify the songs which were Larusson's work.



**Forwarded Conversation**
**Subject: Inv 5 Song List**
--------------------------

From: BADAZZ ONLINE <tq@badazzmusic.com>
Date: Sun, Mar 18, 2018 at 10:26 PM
To: Ice Starr <ICESTARRBEATZ@gmail.com>


Hey can you list the songs you produced please.

--
Taquari 'TQ' Hatch
Manager: Boosie Badazz
Phone: 504-413-3029
COO of Bad Azz Music Syndicate
Instagram: @therealtq

FOLLOW BOOSIE: Instagram | Twitter | Tumblr | Facebook

--------------------------

From: Ice Starr <icestarrbeatz@gmail.com>
Date: Mon, Mar 19, 2018 at 1:51 PM
To: BADAZZ ONLINE <tq@badazzmusic.com>

Hey, no problem. Here are the songs.

Smooth Operator
Ice On My Baby
We're All We Got
Hoop Dreams
Wanna Fuck
Plotting
Bought A Patek

144.     TQ Hatch had actual knowledge that Mr. Larusson had received zero credit or

compensation for his recordings and composition on the Investments 5 album.

145.     In response to requests for payment, producer credits and royalties, TQ Hatch

later told Larusson, "yeah there was a huge mixup" and that Hatch would "get you

everything today so we can move fast."

146.     But TQ Hatch never made good on his promise to correct the "mixup" and "get

[Larusson] everything" he deserved with respect to production credit, licensing fees, and

royalties.

147.     The song *Ice On My Baby* was also released on the Investments 5 album but has

since been removed from the album on select platforms and re-released separately.

148.    The song *Ice On My Baby* is a derivative work of the Larusson composition and recording *Holla*.

149.    In April 2018, months after *Ice On My Baby* was released and generating revenue, Defendant Sony Music Entertainment (Columbia) sent Larusson a Certificate of Employment and payment purportedly for a "work-for-hire" arrangement for the *Ice On My Baby* composition and recording (the "Ice On My Baby Employment Certificate"). A copy is attached hereto as <u>Exhibit 2</u>.

150.    Larusson signed the Certificate on May 4, 2018, over a year after Larusson had first published the original *Holla* recording and composition on January 1st 2017.

151.    The Ice On My Baby Employment Certificate is titled "Certificate of Employment".

152.    The Ice On My Baby Employment Certificate was not signed by any other party.

153.    Larusson was not represented by counsel when he signed the certificate.

154.    Larusson never performed any services for Sony Music Entertainment or Columbia.

155.    Sony Music Entertainment or Columbia never commissioned Larusson to perform any services.

156.    Accordingly, because the track *Miss You* recording and composition had already been created by Larusson and published in January 2017, Sony Music Entertainment or Columbia never provided the impetus for, participated in, or had power to supervise the creation of the work.

157.    Likewise, Sony Music Entertainment or Columbia never invested in the creation of the work whatsoever.

158.     The Ice On My Baby Employment Certificate is a sham work-for-hire certificate that attempts to bootstrap an assignment of Larusson's rights to the already infringed derivative work *Ice On My Baby*.

159.     Accordingly, the Ice On My Baby Employment Certificate is invalid, void, and/or unenforceable.

160.     Similar to the Miss It Employment Certificate, the Ice On My Baby Employment Certificate was presented to Mr. Larusson after his recordings and compositions had already been misappropriated and was generating revenue.

161.     Mr. Larusson is not a native English speaker, and English is a second language to him.

162.     This information was known by Defendants, Yung Bleu, Hatch, and Defendant Sony music Entertainment and/or Columbia at the time the Miss You Certificate and the Ice On My Baby Employment Certificate were signed.

163.     However, after infringing on Larusson's recordings and compositions, Hatch and Sony attempted to have Mr. Larusson sign a sham "Certificate of Employment" alleging a false work-for-hire arrangement.

164.     Yung Bleu and his team knew that *Ice On My Baby* was going to be a hit, so they got Larusson to sign a sham "work for hire" agreement/certificate of employment in an attempt to keep all the revenue from *Ice On My Baby* and give Larusson nothing.

165.     Apart from *Ice On My Baby*, the other six derivative works performed by Yung Bleu on Investments 5 which Larusson created are completely unauthorized.

166.     There were no prior discussions with any of the Defendants and Mr. Larusson regarding the use or authorization of the other six derivative works performed on Investments 5.

167.     While the Yung Bleu tracks have generated three years of streaming and sales revenue, Larusson has received nothing.

168.     These songs are available for streaming on major services under completely false production credits. For example, on Spotify, the Investments 5 song credits are fraudulently credited (see example below).



169.     Yung Bleu has released and commercialized additional songs which use Larusson's compositions and recordings without Mr. Larusson's permission or knowledge. These songs, which are still generating revenue today, include:

| Larusson Composition and Recording | Yung Bleu Unauthorized Song |
|:---:|:---:|
| *The Plan* | *The Plan* |
| *Survive* | *Old Me (feat. Moneybagg Yo)* |
| *Be Easy* | *My Boys* |

170.     In sum, Larusson, has not been paid any royalties from Yung Bleu, despite his compositions and recordings being used in songs that collectively have hundreds of millions of monetized streams across all major platforms.

171.     All Larusson has received is two payments of $750.00 based on sham work-for-hire certificates falsely claiming that Mr. Larusson's works were created during his employment to create *Ice On My Baby* and *Miss It*, despite the fact that the original works *Miss You* and *Holla* were published by Larusson independently well before Yung Bleu took them for his own.

172.     Vice and Play Productions is a production company associated with Defendant TQ Hatch.

173.     The Bad Azz Defendants and Vice and Play Productions published, distributed, and marketed Investments 5 through an independent distribution arrangement had later entered into a joint venture with Columbia Records.

174.     Columbia Records later released *Miss It* and re-releases of *Ice On My Baby* and the track's remixes.

175.     916 Entertainment Group, LLC originally published, distributed, and marketed and credited as the original publisher of the Investments 5 Album.

176.     Vandross Music Group, Inc. is a record label that published distributed, and marketed the derivative works titled *The Plan* and *Old Me (feat. Moneybagg Yo)*.

177.      Empire Distribution Inc., later re-released and published, distributed and marketed

the derivative works titled *The Plan* and *Old Me (feat. Moneybagg Yo)*.

178.      Horus Music Limited and VISO distributed and marketed the Investments 5

album through online streaming and play services such as YouTube as well as *My Boys*.

### III.     *Subsequent to publicly displaying his Copyrighted Works on Beatstars, Soundclick, and YouTube Larusson has registered his works with the U.S. Copyright Office.*

179.      Larusson registered his full and exclusive copyright in *Miss You* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 3.

180.      Larusson registered his full and exclusive copyright in *Holla* with the U.S.

Copyright Office on May 10, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 4.

181.      Larusson registered his full and exclusive copyright in *Big Dreams* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

182.      Larusson registered his full and exclusive copyright in *Too Late* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

183.      Larusson registered his full and exclusive copyright in *Deja Vu* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

184.      Larusson registered his full and exclusive copyright in *Came From Nothing* with

the U.S. Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the

foregoing registration is attached hereto as Exhibit 5.

185.     Larusson registered his full and exclusive copyright in *Atlantic* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

186.     Larusson registered his full and exclusive copyright in *The Plan* with the U.S.

Copyright Office on May , 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

187.     Larusson registered his full and exclusive copyright in *Survive* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

188.     Larusson registered his full and exclusive copyright in *Get Me Hip* with the U.S.

Copyright Office on May 3, 2021. The Certificate of Copyright reflecting the foregoing

registration is attached hereto as Exhibit 5.

## LEGAL CLAIMS

### As And For A First Cause of Action:
### COPYRIGHT INFRINGEMENT
### as to *Big Dreams* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants; 916 Entertainment Group LLC, Vice and Play Productions, LLC; Horus Music Limited; Broadband TV Corp d/b/a VISO Music; John Does #1-10

189.     Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth

here.

190.     *Hoop Dreams* is an unauthorized derivative work of Larusson's sound recording

and composition entitled *Big Dreams*.

191.     Defendants' Jeremy Biddle; Taquari Hatch; Bad Azz, LLC; 916 Entertainment

Group LLC, Vice and Play Productions, LLC; Horus Music Limited; Broadband TV

Corp d/b/a VISO Music; John Does #1-10's (collectively referred to as the "Investments 5 Defendants") reproduction, distribution, and public performances of the infringing work, *Hoop Dreams* in the United States and internationally, continue to this day, and the Investments 5 Defendants have not deigned to compensate the copyright owner. The Investments 5 Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *Hoop Dreams*, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

192.     Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *Hoop Dreams* derivative work using *Big Dreams*, thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

193.     The conduct of the Investments 5 Defendants is knowing and willful.

194.     As a direct and/or proximate result of the Investments 5 Defendants' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and Investments 5 Defendants have profited in an amount of millions of dollars and to be determined at trial.

195.     The Investments 5 Defendants infringed on Plaintiffs' exclusive copyright in *Big Dreams* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings, embodying *Hoop Dreams*. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Investments 5 Defendants have realized illegal revenues.

196.     The Investments 5 Defendants infringed on Larusson's exclusive copyright in *Big Dreams* when they issued and/or authorized others to issue licenses to third parties for the

use, publication, and exploitation of *Hoop Dreams*. Said licenses were issued without any

consent or authority from the copyright owner of *Big Dreams* to produce or distribute the

unauthorize derivative work *Hoop Dreams*. By virtue of this unauthorized commercial

exploitation, the Investments 5 Defendants have realized illegal revenues.

197.    As a result of Investments 5 Defendants' actions, the *Hoop Dreams* derivative

work is available through multiple websites hosted by Internet service providers all

around the world.

198.    Because the Investments 5 Defendants' infringement, Larusson has sustained

substantial injury, loss, and damages in an amount of be determined at trial, and upon

information and belief, the Investments 5 Defendants have derived income and profits to

which they are not entitled.

199.    As a direct and/or proximate result of the Investments 5 Defendants' infringement

on Plaintiff's copyright in *Big Dreams*, Plaintiff has suffered damages. Said injuries are

continuing and will not abate in the future.

**As And For A Second Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Too Late* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants; 916**
**Entertainment Group LLC, Vice and Play Productions, LLC; Horus Music Limited;**
**Broadband TV Corp d/b/a VISO Music; John Does #1-10**

200.    Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth

here.

201.    *We All We Got* is an unauthorized derivative work of Larusson's sound recording

and composition entitled *Too Late*.

202.    The Investments 5 Defendants' reproduction, distribution, and public performances of the infringing work, *We All We Got* in the United States and internationally, continue to this day, and the Investments 5 Defendants have not deigned to compensate the copyright owner. The Investments 5 Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *We All We Got*, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

203.    Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *We All We Got* derivative work using *Too Late*, thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

204.    The conduct of the Investments 5 Defendants is knowing and willful.

205.    As a direct and/or proximate result of the Investments 5 Defendants' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and Investments 5 Defendants have profited in an amount in the amount of hundreds of millions of dollars and to be determined at trial.

206.    The Investments 5 Defendants infringed on Plaintiffs' exclusive copyright in *Too Late* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings, embodying *We All We Got*. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Investments 5 Defendants have realized illegal revenues.

207.    The Investments 5 Defendants infringed on Larusson's exclusive copyright in *Too Late* when they issued and/or authorized others to issue licenses to third parties for the

use, publication, and exploitation of *We All We Got.* Said licenses were issued without

any consent or authority from the copyright owner of *Too Late* to produce or distribute

the unauthorize derivative work *We All We Got*. By virtue of this unauthorized

commercial exploitation, the Investments 5 Defendants have realized illegal revenues.

208.       As a result of the Investments 5 Defendants' actions, the *We All We Got*

derivative work is available through multiple websites hosted by Internet service

providers all around the world.

209.       Because of the Investments 5 Defendants' infringement, Larusson has sustained

substantial injury, loss, and damages in an amount of be determined at trial, and upon

information and belief, the Investments 5 Defendants have derived income and profits to

which they are not entitled.

210.       As a direct and/or proximate result of the Investments 5 Defendants' infringement

on Plaintiff's exclusive copyright in *Too Late*, Plaintiff has suffered damages. Said injuries

are continuing and will not abate in the future.

**As And For A Third Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Miss You* Against Defendants Jeremy Biddle; Taquari Hatch; Torence Hatch;**
**Bad Azz Defendants, LLC; Sony Music Entertainment parent of Columbia Records, Inc;**
**Empire Distribution, Inc.; Vice and Play Productions, LLC; and John Does #2-10**

211.       Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth

here.

212.       *Miss It* is an unauthorized derivative work of Larusson's sound recording and

composition entitled *Miss You*.

213.      Defendants Jeremy Biddle; Taquari Hatch; Torence Hatch; Bad Azz, LLC; Sony

Music Entertainment parent of Columbia Records, Inc; Empire Distribution, Inc.; Vice

and Play Productions, LLC; and on information and belief John Does 2-10's (collectively

the "Miss You Defendants") reproduction, distribution, and public performances of the

infringing work, *Miss It* and any remixes in the United States and internationally,

continue to this day, and the Miss You Defendants have not compensated the copyright

owner, Larusson. The Miss You Defendants' reproduction, distribution, public

performance, streaming, concerts, merchandizing, synchronization, licensing and

economic exploitation of *Miss It* and any remixes, and authorizing others to do the same,

infringes Plaintiff's exclusive rights under the Copyright Act.

214.      Despite the forgoing, Yung Bleu and Taquari Hatch, with the assistance of

Torence Hatch, prepared the *Miss It* derivative work and remixes using *Miss You*, thereby

infringing Larusson's exclusive right under the Copyright Act to prepare derivative

works from the Composition.

215.      The conduct of the Miss You Defendants is knowing and willful.

216.      As a direct and/or proximate result of the Miss You Defendants wrongful

conduct, Larusson has been irreparably harmed and suffered damage, and the Miss You

Defendants have profited in the amount of millions of dollars and to be determined at

trial.

217.      The Miss You Defendants infringed on Plaintiffs' exclusive copyright in *Miss*

*You* when they distributed and sold sound recordings, including digital downloads,

licenses, streaming, and all other economic exploitation and video recordings, embodying

*Miss It* and any remixes. Such reproduction and release was wholly unauthorized, as it

was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Miss You Defendants have realized illegal revenues.

218.   The Miss You Defendants infringed on Larusson's exclusive copyright in *Miss You* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *Miss It* and any remixes. Said licenses were issued without any consent or authority from the copyright owner of *Miss You* to produce or distribute the unauthorized derivative work *Miss It*. By virtue of this unauthorized commercial exploitation, the Miss You Defendants have realized illegal revenues.

219.   As a result of the Miss You Defendants' actions, the *Miss It* derivative work is available through multiple websites hosted by Internet service providers all around the world.

220.   Because of the Miss You Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon information and belief, the Miss You Defendants have derived income and profits to which they are not entitled.

221.   As a direct and/or proximate result of the Miss You Defendants' infringement on Plaintiff's copyright in *Miss You*, Plaintiff has suffered damages. Said injuries are continuing and will not abate in the future.

**As And For A Fourth Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Holla*, Against Jeremy Biddle; Taquari Hatch; Torence Hatch; Bad Azz Defendants; Sony Music Entertainment parent of Columbia Records, Inc; Empire Distribution, Inc.; Vice and Play Productions, LLC; and John Does #2-10**

222.   Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

223.       *Ice On My Baby* is an unauthorized derivative work of Larusson's sound recording and composition entitled *Holla*.

224.       Defendants Jeremy Biddle; Taquari Hatch; Torence Hatch; Bad Azz, LLC; Sony Music Entertainment parent of Columbia Records, Inc; Empire Distribution, Inc.; Vice and Play Productions, LLC; and on information and belief John Does 2-10's (collectively the "Holla Defendants") reproduction, distribution, and public performances of the infringing work, *Ice On My Baby* and any remixes in the United States and internationally, continue to this day, and the Holla Defendants have not deigned to compensate the copyright owner. The Holla Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *Ice On My Baby* and any remixes, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

225.       Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *Ice On My Baby* derivative work and any remixes using *Holla*, thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

226.       The conduct of the Holla Defendants is knowing and willful.

227.       As a direct and/or proximate result of the Holla Defendants ' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and the Holla Defendants have profited in an amount in the amount of millions of dollars and to be determined at trial.

228.       The Holla Defendants infringed on Plaintiffs' exclusive copyright in *Holla* when it distributed and sold sound recordings, including digital downloads, licenses, streaming,

and all other economic exploitation and video recordings, embodying *Holla* and any remixes. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Holla Defendants have realized illegal revenues.

229.     The Holla Defendants infringed on Larusson's exclusive copyright in *Holla* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *Ice On My Baby* and any remixes. Said licenses were issued without any consent or authority from the copyright owner of *Holla* to produce or distribute the unauthorize derivative work *Ice On My Baby* and any remixes. By virtue of this unauthorized commercial exploitation, the Holla Defendants have realized illegal revenues.

230.     As a result of the Holla Defendants' actions, *Ice On My Baby* is available through multiple websites hosted by Internet service providers all around the world.

231.     Because of the Holla Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon information and belief, the Holla Defendants have derived income and profits to which they are not entitled.

232.     As a direct and/or proximate result of the Holla Defendants' infringement on Plaintiff's copyright in *Holla,* Plaintiff has suffered damages. Said injuries are continuing and will not abate in the future.

**As And For A Fifth Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Deja Vu* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants; 916**
**Entertainment Group LLC, Vice and Play Productions, LLC; Horus Music Limited;**
**Broadband TV Corp d/b/a VISO Music; John Does #1-10**

233.    Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth

here.

234.    *Wanna Fuck* is an unauthorized derivative work of Larusson's sound recording

and composition entitled *Deja Vu*.

235.    The Investments 5 Defendants' reproduction, distribution, and public

performances of the infringing work, *Wanna Fuck* in the United States and

internationally, continue to this day, and the Investments 5 Defendants have not deigned

to compensate the copyright owner. The Investments 5 Defendants ' reproduction,

distribution, public performance, streaming, concerts, merchandizing, synchronization,

licensing and economic exploitation of *Wanna Fuck*, and authorizing others to do the

same, infringes Plaintiffs' exclusive rights under the Copyright Act.

236.    Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *Wanna Fuck*

derivative work using *Deja Vu*, thereby infringing Larusson's exclusive right under the

Copyright Act to prepare derivative works from the Composition.

237.    The conduct of the Investments 5 Defendants is knowing and willful.

238.    As a direct and/or proximate result of the Defendants ' wrongful conduct,

Larusson has been irreparably harmed, suffered damage, and the Investments 5

Defendants have profited in the amount of millions of dollars and to be determined at

trial.

239.    The Investments 5 Defendants infringed on Plaintiffs' exclusive copyright in *Deja

Vu* when it distributed and sold sound recordings, including digital downloads, licenses,

streaming, and all other economic exploitation and video recordings, embodying *Wanna*

*Fuck.* Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, Investments 5 Defendants have realized illegal revenues.

240.     The Investments 5 Defendants infringed on Larusson's exclusive copyright in *Deja Vu* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *Wanna Fuck.* Said licenses were issued without any consent or authority from the copyright owner of *Deja Vu* to produce or distribute the unauthorize derivative work *Wanna Fuck*. By virtue of this unauthorized commercial exploitation, the Investments 5 Defendants have realized illegal revenues.

241.     As a result of Investments 5 Defendants' actions, the *Wanna Fuck* derivative work is available through multiple websites hosted by Internet service providers all around the world.

242.     Because of the Investments 5 Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon information and belief, the Investments 5 Defendants have derived income and profits to which they are not entitled.

243.     As a direct and/or proximate result of the Defendants' infringement on Plaintiff's exclusive copyright in *Deja Vu*, Plaintiff has suffered damages. Said injuries are continuing and will not abate in the future.

**As And For A Sixth Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Came From Nothing* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants;**
**916 Entertainment Group LLC, Vice and Play Productions, LLC; Horus Music Limited;**
**Broadband TV Corp d/b/a VISO Music; John Does #1-10**

244.     Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

245.     *Plottin* is an unauthorized derivative work of Larusson's sound recording and composition entitled *Came From Nothing*.

246.     The Investments 5 Defendants reproduction, distribution, and public performances of the infringing work, *Plottin* and *Plottin (feat. Derez DeShon)* in the United States and internationally, continue to this day, and the Investments 5 Defendants have not deigned to compensate the copyright owner. The Investments 5 Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *Plottin* and *Plottin (feat. Derez DeShon)*, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

247.     Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *Bought A Patek* derivative work using *Came From Nothing*, thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

248.     The conduct of the Investments 5 Defendants is knowing and willful.

249.     As a direct and/or proximate result of the Investments 5 Defendants' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and the Investments 5 Defendants have profited in the amount of millions of dollars and to be determined at trial.

250.     The Investments 5 Defendants infringed on Plaintiffs' exclusive copyright in *Came From Nothing* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings,

embodying *Came From Nothing*. Such reproduction and release was wholly

unauthorized, as it was without any license or consent of authority from the Plaintiff. By

virtue of this unauthorized commercial exploitation, the Investments 5 Defendants have

realized illegal revenues.

251.    The Investments 5 Defendants infringed on Larusson's exclusive copyright in

*Came From Nothing* when they issued and/or authorized others to issue licenses to third

parties for the use, publication, and exploitation of *Plottin* and *Plottin (feat. Derez

DeShon)*. Said licenses were issued without any consent or authority from the copyright

owner of *Came From Nothing* to produce or distribute the unauthorize derivative work

*Plottin* and *Plottin (feat. Derez DeShon)*. By virtue of this unauthorized commercial

exploitation, the Investments 5 Defendants have realized illegal revenues.

252.    As a result of the Investments 5 Defendants' actions, the *Plottin (feat. Derez

DeShon)* derivative work is available through multiple websites hosted by Internet

service providers all around the world.

253.    Because of the Investments 5 Defendants' infringement, Larusson has sustained

substantial injury, loss, and damages in an amount of be determined at trial, and upon

information and belief, the Investments 5 Defendants have derived income and profits to

which they are not entitled.

254.    As a direct and/or proximate result of the Investments 5 Defendants ' infringement

on Plaintiff's exclusive copyright in *Came From Nothing*, Plaintiff has suffered damages.

Said injuries are continuing and will not abate in the future.

### As And For A Seventh Cause of Action:
### COPYRIGHT INFRINGEMENT

**as to *Atlantic* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants; 916 Entertainment Group LLC, Vice and Play Productions, LLC; Horus Music Limited; Broadband TV Corp d/b/a VISO Music; John Does #1-10**

255.       Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

256.       *Smooth Operator* is an unauthorized derivative work of Larusson's sound recording and composition entitled *Atlantic*.

257.       The Investments 5 Defendants' reproduction, distribution, and public performances of the infringing work, *Smooth Operator* in the United States and internationally, continue to this day, and Defendants have not deigned to compensate the copyright owner. The Investments 5 Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *Smooth Operator*, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

258.       Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *Smooth Operator* derivative work using *Atlantic*, thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

259.       The conduct of the Investments 5 Defendants is knowing and willful.

260.       As a direct and/or proximate result of the Investments 5 Defendants' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and Investments 5 Defendants have profited in the amount of millions of dollars and to be determined at trial.

261.     The Investments 5 Defendants infringed on Plaintiffs' exclusive copyright in *Atlantic* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings, embodying *Smooth Operator*. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Investments 5 Defendants have realized illegal revenues.

262.     The Investments 5 Defendants infringed on Larusson's exclusive copyright in *Atlantic* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *Smooth Operator*. Said licenses were issued without any consent or authority from the copyright owner of *Atlantic* to produce or distribute the unauthorize derivative work *Smooth Operator*. By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

263.     As a result of Defendants' actions, the *Smooth Operator* derivative work is available through multiple websites hosted by Internet service providers all around the world.

264.     Because of the Investments 5 Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon information and belief, the Investments 5 Defendants have derived income and profits to which they are not entitled.

265.     As a direct and/or proximate result of the Investments 5 Defendants' infringement on Plaintiffs' exclusive copyright in *Atlantic*, Plaintiff has suffered damages. Said injuries are continuing and will not abate in the future.

**As And For A Eighth Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *The Plan* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants; Vandross**
**Music Group, Inc.; Empire Distribution, Inc.; and John Does #2-10**

266.     Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth

here.

267.     *The Plan (Yung Bleu)* is an unauthorized derivative work of Larusson's sound

recording and composition entitled *The Plan*.

268.     Defendants' Jeremy Biddle; Taquari Hatch; Bad Azz, LLC; Vandross Music

Group, Inc.; Empire Distribution, Inc.; and on information and belief John Does #2-10's

(the "Survive Defendants") reproduction, distribution, and public performances of the

infringing work, *The Plan (Yung Bleu)* in the United States and internationally*,* continue

to this day, and the Survive Defendants have not deigned to compensate the copyright

owner. The Survive Defendants' reproduction, distribution, public performance,

streaming, concerts, merchandizing, synchronization, licensing and economic

exploitation of *The Plan (Yung Bleu)*, and authorizing others to do the same, infringes

Plaintiffs' exclusive rights under the Copyright Act.

269.     Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *The Plan (Yung*

*Bleu)* derivative work using Larusson's composition and recording by the same name

(*The Plan*), thereby infringing Larusson's exclusive right under the Copyright Act to

prepare derivative works from the Composition.

270.     The conduct of the Survive Defendants is knowing and willful.

271.     As a direct and/or proximate result of the Survive Defendants' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and the Survive Defendants have profited in the amount of millions of dollars and to be determined at trial.

272.     The Survive Defendants infringed on Plaintiffs' exclusive copyright in *The Plan* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings, embodying *The Plan (Yung Bleu)*. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Survive Defendants have realized illegal revenues.

273.     The Survive Defendants infringed on Larusson's exclusive copyright in *The Plan* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *The Plan (Yung Bleu)*. Said licenses were issued without any consent or authority from the copyright owner of *The Plan* to produce or distribute the unauthorize derivative work *The Plan (Yung Bleu)*. By virtue of this unauthorized commercial exploitation, Survive Defendants have realized illegal revenues.

274.     As a result of the Survive Defendants' actions, the *The Plan (Yung Bleu)* derivative work is available through multiple websites hosted by Internet service providers all around the world.

275.     Because of the Survive Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon information and belief, the Survive Defendants have derived income and profits to which they are not entitled.

276.    As a direct and/or proximate result of the Survive Defendants' infringement on Plaintiff's exclusive copyright in *The Plan*, Plaintiff has suffered damages. Said injuries are continuing and will not abate in the future.

**As And For A Ninth Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Survive* Against Jeremy Biddle; Taquari Hatch; Bad Azz Defendants; Vandross Music Group, Inc.; Empire Distribution, Inc.; and John Does #2-10**

277.    Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

278.    *Old Me (feat. Moneybagg Yo)* is an unauthorized derivative work of Larusson's sound recording and composition entitled *Survive*.

279.    The Survive Defendants' reproduction, distribution, and public performances of the infringing work, *Old Me (feat. Moneybagg Yo)* in the United States and internationally*,* continue to this day, and Defendants have not deigned to compensate the copyright owner. The Survive Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *Old Me (feat. Moneybagg Yo)*, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

280.    Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *Old Me (feat. Moneybagg Yo)* derivative work using *Survive*, thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

281.    The conduct of the Survive Defendants is knowing and willful.

282.     As a direct and/or proximate result of the Survive Defendants ' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and the Survive Defendants have profited in the amount of millions of dollars and to be determined at trial.

283.     The Survive Defendants infringed on Plaintiffs' exclusive copyright in *Survive* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings, embodying *Old Me (feat. Moneybagg Yo)*. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Survive Defendants have realized illegal revenues.

284.     The Survive Defendants infringed on Larusson's exclusive copyright in *Survive* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *Old Me (feat. Moneybagg Yo).* Said licenses were issued without any consent or authority from the copyright owner of *Survive* to produce or distribute the unauthorize derivative work *Old Me (feat. Moneybagg Yo)*. By virtue of this unauthorized commercial exploitation, the Survive Defendants have realized illegal revenues.

285.     As a result of Defendants' actions, the *Old Me (feat. Moneybagg Yo)* derivative work is available through multiple websites hosted by Internet service providers all around the world.

286.     Because of the Survive Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon

information and belief, Defendants have derived income and profits to which they are not entitled.

287.    As a direct and/or proximate result of the Survive Defendants' infringement on Plaintiff's exclusive copyright in *Survive*, Plaintiff has suffered damages. Said injuries are continuing and will not abate in the future.

**As And For A Tenth Cause of Action:**
**COPYRIGHT INFRINGEMENT**
**as to *Be Easy* Against Jeremy Biddle; Taquari Hatch; Defendants; Vandross Music**
**Group, Inc.; Broadband TV Corp d/b/a VISO Music; and John Does #2-10**

288.    Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

289.    *My Boys* is an unauthorized derivative work of Larusson's sound recording and composition entitled *Be Easy*.

290.    The Survive Defendants' reproduction, distribution, and public performances of the infringing work, *My Boys* in the United States and internationally*,* continue to this day, and Defendants have not deigned to compensate the copyright owner. The Survive Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of *My Boys*, and authorizing others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

291.    Despite the forgoing, Yung Bleu and Taquari Hatch prepared the *My Boys* derivative work using *Be Easy* thereby infringing Larusson's exclusive right under the Copyright Act to prepare derivative works from the Composition.

292.    The conduct of the Survive Defendants is knowing and willful.

293.     As a direct and/or proximate result of the Survive Defendants ' wrongful conduct, Larusson has been irreparably harmed, suffered damage, and the Survive Defendants have profited in the amount of millions of dollars and to be determined at trial.

294.     The Survive Defendants infringed on Plaintiffs' exclusive copyright in *Be Easy* when it distributed and sold sound recordings, including digital downloads, licenses, streaming, and all other economic exploitation and video recordings, embodying *My Boys*. Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, the Survive Defendants have realized illegal revenues.

295.     The Survive Defendants infringed on Larusson's exclusive copyright in *Be Easy* when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of *My Boys*. Said licenses were issued without any consent or authority from the copyright owner of *Be easy* to produce or distribute the unauthorize derivative work *My Boys*.  By virtue of this unauthorized commercial exploitation, the Survive Defendants have realized illegal revenues.

296.     As a result of Defendants' actions, the *My Boys* derivative work is available through multiple websites hosted by Internet service providers all around the world.

297.     Because of the Survive Defendants' infringement, Larusson has sustained substantial injury, loss, and damages in an amount of be determined at trial, and upon information and belief, Defendants have derived income and profits to which they are not entitled.

298.    As a direct and/or proximate result of the Survive Defendants' infringement on

Plaintiff's exclusive copyright in *Be Easy*, Plaintiff has suffered damages. Said injuries

are continuing and will not abate in the future.

### As And For A Eleventh Cause of Action:
### UNJUST ENRICHMENT
### against Defendants John Does #11-20

299.    Plaintiff realleges and incorporates by reference each allegation contained in the

paragraphs above, and by reference repleads and incorporates them as though fully set forth

here.

300.    John Does #11-20 knowingly and intentionally licensed the Infringing Works, and

controlled licensing, mechanical licensing, and collection of royalties.

301.    John Does #11-20 signed mechanical licensees with record labels authorizing the

inclusion of the Infringing Work.

302.    John Does #11-20 have benefitted substantially from and exploitation of the

Infringing Works

303.    John Does #11-20 have received a monetary benefit from the Infringing Works in

the form of licensing, mechanical licensing, and collection of royalties.

304.    John Does #11-20 accepted the benefits from exploitation of the infringing works

such that it would be inequitable for John Does #11-20 to retain the benefits received from

the Infringing Works without fully compensating Larusson for unauthorized use of his

copyrighted sound recordings and compositions.

305.    Larusson has been deprived of compensation associated with his sound recordings

and compositions.

306.    Larusson has been deprived of his right to select a party to administer the catalog

of his sound recordings and compositions and control the distribution, licensing, mechanical licensing, and collection of royalties.

307.    John Does #11-20 have been unjustly enriched by exploitation of the Infringing Works including through the unauthorized administration of the catalog of his sound recordings and compositions, licensing, mechanical licensing, and collection of royalties.

308.    Accordingly, Larusson is entitled to damages for John Does #11-20 in an amount to be determined at trial.

**As And For A Twelfth Cause of Action:**
**DECLARATORY JUDGMENT**
**against Defendant Vice and Play Management**

309.    Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

310.    As set forth above, Vice and Play Management LLC submitted a "Certificate of Employment" to Mr. Larusson referencing a Master recording of *Miss It*.

311.    The Miss It Employment Certificate was signed only by Mr. Larusson.

312.    The Miss It Employment Certificate of Employment was based on false representation that Vice and Play commissioned services from Larusson. It did not.

313.    Larusson was induced into signing the Miss It Employment Certificate based on material misrepresentations of TQ Hatch that there would be a continued business relationship.

314.    TQ Hatch made a material omission in the *Miss It* had already been published on February 14, 2017.

315.     On information and belief, TQ Hatch always intended to use unauthorized versions of Larusson's recordings and compositions and only seek to retroactively gain licenses after the derivative works gained popularity.

316.     On information and belief, TQ would wait until tracks started gaining popularity then would seek "Employment Certificate(s)" from Larusson to cover his and Yung Bleu's infringement.

317.     The Miss It Employment Certificate is inherently incoherent in that it references "Project", "Services", "Masters" and underlying compositions that were never lawfully provided or commissioned by Plaintiff.

318.     The Miss It Employment Certificate pertains to "Contributor's Services" which were not commissioned by Vice and Play Management LLC.

319.     Any assignment language in the Miss It Employment Certificate references non-existent "Contributor Services" and is predicated on a false premise and definition.

320.     Larusson is entitled to a declaration that the Miss It Employment Certificate is not a valid work-for-hire agreement pursuant to 17 U.S.C. § U.S. Code § 201.

321.     Larusson is entitled to a declaration that the Miss It Employment Certificate is void, invalid, or otherwise enforceable on the grounds of lack of mutual assent, unconscionability, and/or inducement.

322.     Larusson is entitled to a declaration that he retains all rights to the underlying recording and composition titled *Miss You*.

323.     Larusson is further entitled to a declaration that Larusson owns all rights to the recording and composition of the derivative work *Miss It*.

**As And For A Thirteenth Cause of Action:**
**DECLARATORY JUDGMENT**

**against Defendant Sony Music Entertainment parent of Columbia Records**

324.      Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth here.

325.      Larusson incorporates herein by reference all of the allegations contained in the preceding and forgoing paragraphs of this Complaint.

326.      Larusson incorporates herein by reference all of the allegations contained in the preceding and forgoing paragraphs of this Complaint.

327.      As set forth above, Sony Music Entertainment parent of Columbia Records submitted a "Certificate of Employment" to Mr. Larusson referencing a services in connection with *Ice On My Baby*.

328.      The Ice On My Baby Employment Certificate was signed only by Mr. Larusson.

329.      The Ice On Baby Certificate of Employment was based on false representation that Sony Music Entertainment commissioned services from Larusson.

330.      On information and belief, TQ Hatch always intended to use unauthorized versions of Larusson's recordings and compositions and only seek to retroactively gain licenses after the derivative works gained popularity.

331.      The Ice On My Baby Employment Certificate is inherently incoherent in that it references "Work", "Services", and underlying recordings and compositions that were never lawfully provided or commissioned by Mr. Larusson.

332.      The Ice On My Baby Employment Certificate makes no reference to the underlying composition or rights therein of the *Ice On My Baby* track.

333.     The Ice On My Baby Employment Certificate only pertains to "services" that were neither commissioned by Sony Music Entertainment nor provided by Mr. Larusson.

334.     Any assignment language in the Ice On My Baby Employment Certificate references non-existent "services" and is predicated on a false premise or definition.

335.     Larusson is entitled to a declaration that the Ice On My Baby Employment Certificate is not a valid work-for-hire agreement pursuant to 17 U.S.C. § U.S. Code § 201.

336.     Larusson is entitled to a declaration that the Ice On My Baby Employment Certificate is void, invalid, or otherwise enforceable on the grounds of lack of mutual assent, unconscionability, and/or inducement.

337.     Larusson is entitled to a declaration that he retains all rights to the underlying recording and composition to the Ice Starr recording and composition titled *Holla*.

338.     Larusson is further entitled to a declaration that Larusson owns all rights to the recording and composition of the derivative work *Ice On My Baby*. In the alternative, Larusson is entitled to a declaration that he owns all rights to the composition of the derivative work *Ice On My Baby*.

## **PRAYER FOR RELIEF**

Plaintiff Arni Larusson respectfully requests that judgment be entered against the enumerated Defendants, as follows:

(A) For judgment that Defendants have violated the Copyright Act and that all such violations have been willful; and

(B) A permanent injunction requiring Defendants and their agents, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or

participation with each and any one of them, to cease infringing and causing, enabling, facilitating, encouraging, promoting, inducing and/or participating in the infringement of any of Larusson's rights protected by the Copyright Act.

(C)  For judgment assessing Defendants for the damages in an amount to be determined at trial suffered by Plaintiffs, including an award of actual damages and Defendants' profits attributable to the infringement, as well as costs and attorney's fees to the full extent provided for by Sections 501, 504 and 505 of the Copyright Act, 17 U.S.C. §§ 501, 504 and 505; damages and profits shall include all profits and damages resulting from exploitation of the work domestically and internationally, as well as any and all profits and damages in the following categories attributable to the infringement, including but not limited to:

1. Record sales;
2. Downloads;
3. Ringtones;
4. Ringback tones;
5. Public performance revenues;
6. Digital revenue;
7. Streaming revenue;
8. Synchronization licensing;
9. Merchandising;
10. Public appearances;
11. Endorsements;
12. Sponsorships;
13. Spokesperson work;
14. Touring revenue;
15. Advertising revenue;
16. Appearance fees;
17. Name and likeness income and increase in value;
18. Rights of publicity income and increase in value;
19. Increased value all Defendants' publishing and/or record company and/or companies;
20. Increased value of all Defendant, including Yung Bleu's catalog;
21. Increased value of music publishing and/or record royalties and rights;
22. Increased value of social media rights, accounts and value;
23. Increased goodwill;

24. Promotional value;
25. Increased value of royalty rate for record deals;
26. Increased value in distribution deals, negotiating power and reduction in costs;
27. Value of obtaining lower cost of administration fees and/or increased advances for publishing deals;
28. Value of obtaining better terms for record company advances and terms and multi-record deals;
29. Value of obtaining better terms of publishing and/or recorded master deals for Yung Bleu's existing catalog and for future works;
30. Increased value in negotiating 360 deals with record companies and/or publishers;
31. Sheet music sales and sheet folio income;
32. Any and all music publisher income;
33. Any and all record master income;
34. Any and all record income;
35. Any and all MCL, SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, and any and all collection society, mechanical society and performance society income worldwide;
36. Any and all producer royalty income;
37. Any and all arrangement income;
38. Any and all income derived from any existing medium or any medium hereinafter developed worldwide;
39. Any and all income from any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act;
40. Any and all income from any society to which any Defendant belongs or joins in the future;
41. Any and all income and/or residuals from SAG-AFTRA;
42. Any and all income from Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, and any and all download and streaming services; and
43. Any and all of Defendants' equity interests in Spotify, and any other music streaming or download services or companies in 29 which one or more Defendant has an interest, as it relates to the value from the inclusion of the infringing song in the service; and

(D)  A declaration that:

1. The Miss It Employment Certificate is not a valid work-for-hire agreement pursuant to 17 U.S.C. § U.S. Code § 201.
2. The Miss It Employment Certificate is void, invalid, or otherwise enforceable on the grounds of lack of mutual assent, unconscionability, and/or inducement.
3. Larusson retains all rights to the underlying recording and composition to the Ice Starr recording and composition titled *Miss You*.

4. Larusson owns all rights to the recording and composition of the derivative work *Miss It*.

5. The Ice On My Baby Employment Certificate is not a valid work-for-hire agreement pursuant to 17 U.S.C. § U.S. Code § 201.

6. The Miss It Employment Certificate is void, invalid, or otherwise enforceable on the grounds of lack of mutual assent, unconscionability, and/or inducement.

7. Larusson is entitled to a declaration that he retains all rights to the underlying recording and composition to the Ice Starr recording and composition titled *Holla*.

(E) Larusson is further entitled to a declaration that Larusson owns all rights to the recording and composition of the derivative work *Ice On My Baby*

(F) For judgment granting such other, further, and different relief as to the Court may seem just and proper, including Plaintiff's costs and reasonable attorneys' fees.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Respectfully submitted, this **2nd** day of **June, 2021.**

ANDERSONDODSON, P.C

*/s/ Penn Dodson*
**Penn A. Dodson (PD 2244)**
*penn@andersondodson.com*
11 Broadway, Suite 615
New York, NY  10004
(212) 961-7639 direct
(646) 998-8051 fax

WERGE LAW GROUP

*/s/ Thomas E.M. Werge*
**Thomas E.M. Werge**
*tom@werge.law*
1627 Vine Street, Suite 200
Denver, CO 80206
(720) 507-5008
(303) 486-5900
*Pro hac vice application forthcoming*